We'll hear argument first this morning in Case 18-281, the Virginia House of Delegates v. Bethune-Hill. Mr. Clement? Mr. Chief Justice, and may it please the Court, in 2011 the Virginia House of Delegates formulated a redistricting plan that garnered overwhelming bipartisan support and swift preclearance by the Justice Department. That plan has governed the first four election cycles of the decade and delivered on its promise to provide African-American voters with the ability to elect their candidates of choice in 12 districts that everybody agreed should be majority-minority districts. The basic choice for this Court will be whether that plan, duly enacted by the people of Virginia, will govern this last election of the decade, or if instead there will be a Court-imposed plan formulated by a special master from out of state. Now, the Virginia Attorney General, for his part, would impose the Court-ordered plan on the people of Virginia on the theory that the House of Delegates lacks appellate standing to appeal. That argument is deeply flawed and has enormous consequences that go well beyond this case, but would be a particularly problematic feature in the all-too-often context where there is an impasse between the legislative branch and the executive branch, and there has to be a Court-ordered plan, and the executive branch are often adverse in that litigation over the Court-ordered plan. Ginsburg. Mr. Clement, here it isn't even the legislative branch. It's one house of the legislature. Clement. That's right, Justice Ginsburg, but I think particularly when you understand that the law at issue here has its object, one branch of the legislature, one house of the legislature, the House of Delegates, that that's exactly the right party to bring this particular case or to vindicate. Sotomayor. But it's not a law that belongs to the one branch. Clement. It has to be approved by the Senate and signed by the governor and survive a veto by the governor if he or she chooses. So it's really a law that doesn't belong to the House. At best, it belongs to the legislature as a whole or to the government, the people of Virginia. Justice Sotomayor, it doesn't belong to the House alone, but it does, in the parts that are challenged here, affect the House and the House alone. Sotomayor. Please tell me why. It doesn't change the composition of the House. It doesn't change any of the legislative processes of the House in terms of how you do things, the number of people involved in doing them, the necessary votes, etc. It may change the membership of individuals, but it doesn't change the processes of the legislature. Clement. So I beg to differ, which is to say I think that when you have the legislative districts, those are not just about elections. Those are the basic way in which the House chooses to organize itself, and they affect day-to-day operations within the House of Delegates. If you watch the House of Delegates proceeding, the first thing you notice is that every member of the House of Delegates is identified by where they come from. It's the gentleman from Norfolk or the gentlewoman from the city of Richmond. Sotomayor. There still will be a gentlelady from Norfolk and a gentleman from wherever. The identity may change in the next election, but at least as currently constituted, those people will not change. And, yes, they may change later, but there's no guarantee that the legislature ever has the person they want to win an election in the House. Well, I don't think it is guaranteed that there will be a gentleman from Norfolk, because if you redistrict in a way that essentially splits Norfolk four ways, there may be no gentleperson from Norfolk. And I think more fundamentally, this is the basic decision as to whether there are going to be a representative government in terms of compact districts, whether they're going to be elongated. I think that if the change from the current representative to another, that's a frequent occurrence. It happens in every time there's a new census. Different lines are drawn, different people will represent a constituency. I think that's true. I mean, I think there may well be an injury for Article III purposes with every decennial census. I don't think, and again, I think the principle that we're arguing for is not going to open up the House to be in front of the courts in lots of different situations. I think it really goes to this fundamental question of how they're going to constitute themselves. Mr. Clement, there are two, as I understand it, you're claiming standing on two theories. One is, and correct me if I'm wrong, one is that you're representing the Commonwealth. The other is that you're representing the House as an institution. Now, as to the first, Virginia says that that was not the basis on which you intervened below, and that this is something new that has come up. Is that correct, and if not, why? I don't think that it is correct. I think that it is true that when we intervened, we intervened to separately represent the House of Delegates and the Speaker in his institutional capacity. And the State did not object to that intervention motion. So one thing I think it's just clear to understand is I don't take the State, and I'll obviously be corrected if I'm wrong, but I don't think take the State to be the House of Delegates' ability to have separate counsel or to be represented by somebody other than the Attorney General. Now, as the so that was the basis for the intervention. As the litigation went on, it became clear that essentially the House of Delegates and their counsel were representing the interests not just of the House of Delegates, but of the Commonwealth as a whole. And that's based on what? On the arguments that were made. The arguments that were made were arguments that represented that went to the represent interests of the Commonwealth? Yes, and the fact that most poignantly and sort of, I think, impressively in front of this Court, there was no separate briefing at all. There was no separate, really, appearance other than a letter that said that they were happy to let us carry the water. And I don't think it's an accident that in this Court's first opinion, when it used a shorthand to refer to the House of Delegates and the Speaker in his institutional capacity, this Court used the shorthand, the State. We were the only party here defending the constitutionality of the statute. We were doing that with the acquiescence of the Attorney General. And I think it's important. One other point I'd just like to make very clear is that if you look at the authorizing statute that the Attorney General is relying on, there's no separate provision for appeal. So as a matter of State statute, it's not like the Federal statutes where there are very specific provisions separately addressing appeal and the Solicitor General's role. Well, I would be very uncomfortable trying to decide whether as a matter of Virginia law, anybody other than the Attorney General can ever represent the Commonwealth or whether the House under some circumstances can also represent the Commonwealth. That's a question of Virginia law. And if that issue were – is before us, there would be an argument for certifying that question to the Supreme Court of Virginia for a determination, because I think it's a hard one for us to make. The Supreme Court of Virginia has allowed the House to intervene under some circumstances, but I don't think that's what the theory was. That's true. I think our ultimate – our alternative argument allows you to avoid having to decide that, and I do think it is a straightforward way to decide the standing question, and it is one that is strongly suggested by the Beans case of this Court. Before you go to the alternative argument, on the representing the State, even supposing that you're right – actually, it seems that you're right – that throughout some part of this litigation, the Attorney General's office was very happy to have the legislature do most of the work. Are you saying that that affects a kind of permanent delegation to the legislature to continue in that capacity, even if and when the Attorney General's office decides, you know, actually, it – something has changed? There now comes a point where we want to resume the head representative role. The answer is yes. I mean, I think that at a certain point, whether you think about it in acquiescence, whether you think about it in forfeiture, at that point, they forfeited the ability to insist that they have the exclusive right to represent the common law. Sotomayor, that's a pretty extreme statement on your part. If I make the assumption that Virginia law doesn't permit you to represent the State – it's only an assumption, for the sake of argument – to now claim that they're saying, you can carry the water now, but I can't fire you and carry my own water when I want to, that's a pretty bold statement, that we're going to permit that kind of forfeiture, basically, argument, or acquiescence argument to be made, where we're taking away from the people of Virginia the right to say who's going to speak on their behalf? No. I think what you're doing is you're recognizing as a matter of Federal law that at a certain point, if in the Federal courts, the executive branch has allowed the House of Delegates and its counsel to represent the interests of the Commonwealth as a whole, there are consequences to that choice, and they can't pull the rug out from that defense at the last minute when it becomes politically expedient. Mr. Clement, I'd like to move to the merits at this point, if that's all right. And I'd like your reaction to, it seems to me the elephant in the room here is the fact that we have a standard that depends heavily on credibility determinations in terms of predominance. And we have a situation the first time around where, you know, Jones was found credible, the experts were found not credible, and then there's a shift, and all of a sudden Jones is incredible and the experts are credible. And when we have a standard of review that asks whether the findings were clearly erroneous, what are we supposed to do with that? I mean, if the way the case had come up was exactly flipped, we'd be deferring to questions of credibility that go one way, and now we're referring to them that go the other way. They both can't be right, and yet our review sort of depends on whoever gets here last. Well, I think that's right, Mr. Chief Justice, and I'd say a couple of things. First of all, I think in reviewing this case, I don't think you have to ignore the fact that there were contrary findings in the first go-around. I also think that in a way you can sidestep the elephant in the room if you find a legal error in the way that the district court committed its or conducted its credibility findings. And here I think you do have that with the double standard that they applied in terms of, well, if you testified for the second time on behalf of the plan, you are not credible because you should have been here the first time, but if you testify for the first time in the second trial against the plan, then it's perfectly excusable and we'll use your testimony. Not only will we credit it, but we'll use your testimony to discredit the other side. I don't think you can have that kind of double standard. I also think that it would be helpful for this Court to provide some guidance on this broader question, because I don't think that you can really simultaneously say that you are going to give good faith to the legislature as a presumption of good faith, a presumption of constitutionality, and then say that all of the witnesses from the legislative branch and all of the people who have direct knowledge as to how the map was drawn and particularly how the VTDs were split, to then determine that they are going to be incredible as a blanket matter. I just don't think you can have them both. I think you end up not giving enough deference. And I'm not saying you could never find the government witnesses incredible, but I think the standard has to be something far more than you see on this record, and I think it would be very helpful if this Court could clarify that as a legal matter. Breyer. What's the clarification? I'm not so worried about this case, but, I mean, there are hundreds of thousands of trials, if not millions, and a certain percentage of them are reversed on appeal and they go back for a second trial. And what happens if the fact finder in the second trial is declared credible? Or all of them, the witnesses and a different judge, maybe, or maybe the same, in the first one said, no, it's the opposite. All right. Now, there are appellate courts all over the world, in this country, who want to know what to do. So what is it we're supposed to do that's capable of being generalized? I think that was the concern, that is a concern, anyway, that I have. So I would say two things, Justice Breyer. I can think of one thing to do, which is you forget about the first trial, you go through here and you look at it and say, is the determination of credibility within the power of the judge who made it? So I would say two things, both of which are different from what you said, Justice Breyer. I mean, one is, I do think in this kind of second trial context, I mean, I think there's room for sort of a State Farm Fox principle, that if you're coming out diametrically opposed, you should at least avert to the fact that you're doing that and have to come up with some slightly better than normal reason to at least explain the change. But the second thing that I think would be more limited to these redistricting cases, and I think it's very important, is when you have a context where the Court has gone out of its way to say that it's particularly important to credit the good faith of the legislatures engaged in a very difficult task, I think you need a heightened standard before you dismiss their testimony across the board. And what you have in this case, I think, is a perfect illustration of it. I mean, the person who was the principal author of the map, everybody agrees, was Delegate Jones. The only person who knows the details of why particular VTD splits was Mr. Morgan. Now, if you say you're going to deem their testimony not just incredible in certain particulars, but across the board, then you're left with Hamlet without the prince. I mean, you're left with a couple of issues. I see where you're going. I have one other question I want to get an answer from you. Suppose you do get standing. Suppose you're right, no, you're wrong about the first half, which is that suppose that we find they're okay in saying that race was used predominantly. Then we get to the question of, well, was there a good reason for that, and the reason they say was compliance with Section 5. And the Court here says, no, it isn't. That isn't a good reason, because what you did is you took a 55 percent black voter standard and you used it for all 12 districts. Now, they elaborated on that, but that isn't a very good – it can be a little bit more tailored than that. Some districts, yes, maybe. Some districts, no. But the House made no effort whatsoever. They just used this 55 percent standard for all. Now, what do you say in response to that? So I want to be very responsive to what I take to be sort of a strict scrutiny question. I'd like to take 30 seconds, if I could, on your premise, which were already past predominance. I would say that before you get predominance and when you ask whether the district court committed a legal error, you have to take a hard look at HD92, because they applied the same legal analysis to all the districts. They came out with the same result as to every district. And I don't really think that's what this Court had in mind last time in remanding this, because these districts look very different, and HD92 is an awfully hard district to say that race predominated, because it went from a BVAP of 62.1 to 60.70. So the 55 percent floor really had no effect on the district. It went from three split voting districts to zero split voting districts, and it became more compact and entirely within the city of Hampton. But if you think nonetheless that race predominated, even as to HD92, and you get to strict scrutiny, then I think the problem with the idea that there was a legal error here in using the target developed principally in HD75 in the other districts, the reason that can't be a legal error is it asks too much of the State legislature in contexts like this, where you're dealing with districts that are all in the same basic part of the State. Maybe that's a northern Virginia perspective on this problem, but these are all districts that are closely related to each other in southeastern Virginia. But even more importantly, they all have the same basic problem when the legislature is confronting this district, these districts, which is everybody, I think, agrees that these districts perform very differently in off-year House of Delegate elections than in presidential elections. So you can, you know, you can have the district-specific information about how many people voted for President Obama in these districts, but I think everybody really agrees that what you really need is to look at the off-year elections, because there's much less turnout and that's where you have a problem with more racially polarized voting. Now in those off-year elections, the single most important data point would be a contested primary, because especially in districts that are going to be relatively Democratic, where you really figure out whether or not the African-American voters get to vote for their candidate of choice, is in a contested primary, because that's when you have an African-American candidate of choice going head-to-head with a white Democrat. And if the – and that's why there aren't that many of those. There's only two or three of those in all of these districts over the decade that precedes the redistricting. And the one that everybody was focused on and seemed to basically agree was the best indicator of that was in HD-75. It was a contested primary election in 2005, and in that election, they – they determined that you needed a 55 percent fee there. KAGAN I'm not sure I understand your answer, Mr. Clement, because if there's one thing that we've made clear again and again, it's that the analysis ought to be district-by-district. And for sure, as you say, there might be things that many districts or some districts share. And you would – you would be prudent to look at those things that they share and to say they share them. But there are also things that the districts do not share. And – and I thought that what we have asked of legislatures is that when they do this, they look at a particular district, and they do something, they explain themselves with respect to that particular district. So if what they do is they say, well, this shares a feature of HD-75, and that would push one way, but on the other hand, it may not share another feature of HD-75, I mean, that's the kind of analysis I would think that we've called for rather than just saying we've done it for HD-75, and gosh, they're all in the same part of the state. That's enough. Well, Justice Kagan, I don't think it was quite that cursory. And there was – there was some other information from other districts. But I think the critical thing is there was a consideration that all these districts share similar problems in not having – it's not like there was this rich, robust data set that they ignored, because they all share the problems of the same dynamic, and you don't have voter registration information by race in any of the districts. So that's another challenge. And so they looked at what they had and what they could go by, and then they extrapolated. And it's not like the record is bereft of evidence that the same principles apply in different districts. I point you to – Well, it is odd, Mr. Clement, that you say they didn't have voting records, because 95 is next to 92, and what the district court did there was to look at both individually and then their impact on each. You said we should look at 92. That stayed more concentrated. But the district court said you can't look at that. You look at that, but you have to look at it in combination of the purpose it served. And the purpose 92 served was to impact directly 95, because they took the blacks from 92 to make more blacks in 95, and they did it in a way that they drew lines in the middle of a street with black houses on one side and white houses on another side. It's hard for me to imagine how race isn't predominant when they're getting down to the nitty-gritty on the basis of what side of a street you live on. I don't know what compactness means when you use a line split of that nature. I don't know how you can look at that and not think that race predominated. So I think that even if you have a concern with the way voting districts were split at the top of 95, far removed from the border with 92, that doesn't give you a basis for invalidating HD 92. And just to finish my answer to Justice Kagan's question, I think if you look at Joint Appendix page 451, you will see Delegate Dance, the delegate from District 63, and she's testifying on the House floor contemporaneously that the 55 percent number are the right numbers for the Richmond districts. So it's not like they didn't have testimony at the time from members of the African-American Caucus that said they were right to apply these numbers across districts. If I may reserve my time. Mr. Coleman, thank you. I'm sorry? Thank you, counsel. Ms. Ratner? Mr. Chief Justice, and may it please the Court, I have two points on standing and two on the merits. On standing, the House as an institution isn't harmed by changes to individual district lines. And while States can authorize legislatures to represent them in court, Virginia hasn't done so. Well, on that first point, injury, in fact, must be concrete, but it doesn't have to be big. That's correct. If something causes me the loss of $5 or causes me to expend an hour that I would rather use for some other purpose, that's injury, in fact. Is it conceivable that this does not have even that kind of an administrative impact on the House of Delegates? I think so, Your Honor, because what we're talking about here is potentially an effect for current incumbents in their capacity as candidates for re-election prospects. And so we're not talking about the current House having any injury. The House, I would think, is agnostic as to which individuals are selected as candidates. I mean, it's hard for me to believe that doesn't cost them one dime. I mean, maybe they publish a map showing the current districts, and they'd have to publish a different map. Maybe they have to print new stationery. Maybe they have to print new labels for offices or for the desks of the delegates. And injury, in fact, as I said, does not require a lot of injury. It has to be concrete, but it doesn't have to be big. Well, at a minimum, though, Justice Alito, it requires evidence of that injury, and all that we have from the House here is a statement of what this Court described in Whitman v. Person Hubbella as a non-obvious sort of injury. That's not sufficient to support standing unless there's evidence or affidavits saying just those types of things. Well, when were they supposed to do that? At what point was their standing challenged so that they would have an obligation to come forward with evidence? You know, it's a little bit unusual given that this standing issue first arises with respect to this appeal. They could have introduced evidence when they intervened, and I would think at the time, the standing issue was challenged with respect to seeking a stay, I believe, in July. And so there could have been some evidence introduced at that point. So Mrs. Rager, suppose that you're right, that the legislature has no interest in who is going to represent each district. But I understood Mr. Clement to be making another argument, which is the legislature does have an interest in representational processes working correctly, and that what something like this does is it confuses the representational process. It essentially blurs lines of accountability because nobody knows who it is that they're supposed to be representing. Are they supposed to be representing their old constituents, or are they supposed to be representing their new constituents? So there are divided loyalties. There's blurred lines of accountability. And that all of that is actually integral, integral to the way a representative institution is supposed to work, and such an institution ought to take an interest in those kinds of things. So let me give you two responses, Justice Kagan. The first is that I don't think it's true that there are current blurred lines of accountability. In fact, under the Virginia Constitution, Article II, Section 6, it's clear that legislators represent their current district. So there's no sense in which there's actually a divided constituency unless we're talking about a current legislator who represents one district and sort of has her mind on a future district in which she'll campaign. I think the second point is that to the extent we're talking about just there may be generally less responsiveness or concern about this as a procedural matter, I do think then we're pushing more toward the type of generalized grievance. It's not clear to me why the House as a body would have a particular interest in that beyond what voters and people in the state of Virginia do. I think another way to illustrate why this isn't really a House-specific injury is by thinking of this, maybe not quite as a zero-sum game, but certainly some current members are going to be benefited by line changes. Others are going to be harmed. And it seems a little bit strange to say that the House has a dog in that fight. How do you distinguish Beans, which seem to deal with a lot of these same issues? Well, Beans, it's hard to know exactly what to read into it because that decision just talks about standing as equivalent to intervention, and we know that that's not appropriate. But even putting that to the side, we do think the type of injury that could have been addressed there is different in kind, not degree. And that's because— Why do you say in kind? Just because reduction in the size? Because I think when you change the size of an institution, particularly when you slash it in half from 67 senators to 35 senators, there are going to be more of these intuitive types of harms of the sort that Justice Alito mentioned before. There may be changes to committee structures, to rules for voting, rules for a quorum, and at least we can imagine some institutional-specific harms there. Whereas here, what we're really talking about are changes in the 100 members who may sit in the House's seats. And that's just not a harm that the institution itself suffers. It's agnostic as to that question. Well, what about the proposition that it does change the nature of the entity if you are moving away from compactness and contiguousness? For example, I guess the example is you may not have representatives who really are, this is Richmond, that's what I represent, but they're going to have part of Richmond, they're going to have part of somebody else, and that changes the nature of the dynamic in the House. Mr. Chief Justice, I would give the same response that I gave to Justice Alito before, which is to the extent that that's really what we're talking about, there has to be some sort of evidentiary showing for those types of standing allegations. There's never been an affidavit put in or any evidence. It doesn't seem intuitive at all that the new plan is necessarily going to be less compact, and there's necessarily going to be some sort of real-world change in the day-to-day operation of the bodies. One could speculate that, and I'm trying to get back to that. Justice Alito spoke about the cost of changing maps. It seems to me that under any law that could be attacked, a representative body could claim a financial harm. Election laws are passed by Congress all the time, and we wouldn't say that both houses individually could come in and challenge those election laws. I don't think we would anyway. And yet, those election laws could require publication of different things and all sorts of things that would change. That's not a harm we would recognize. So even if a particular legislator – well, the particular legislator might have standing if he or she says, I campaign differently with this district as opposed to that district, but I still don't see why that would give the House standing. So a couple of things – Mr. Ratner, why don't you answer and then move to the merits after that? Okay. A couple of things. With respect to the first part of your question, yes, that's why the United States is taking a position on standing here. We worry that some of these theories and speculation could have far-reaching unintended consequences. And that's why, at a minimum, we would hope that the Court would adopt a very cabined version of Beans if it wants to find standing here. As to your second point, the Court has left open the question in Whitman against Person Hubbella whether an individual legislator could have standing here. Turning to the merits, we think that the district court committed legal error here. It applied across-the-board significance to a racial target that really had varying effects on these districts, and we think that it didn't sufficiently discuss non-racial motives for why – You know, this is being said in a very generalized way, but I – this is a very long and carefully reasoned opinion. Every single district, the judge addressed – and it wasn't an overall statement about this is – this 55 is the only thing I'm relying on. He went through every single individual district and pointed to problems with that district. And with facts that they – I shouldn't say he, it was a panel – that they found convincing. How do we get past clear error? So, Justice Sotomayor, we think there's a legal error here, not – we haven't gone on to discuss the clear error question. And I think that's most clear as seen, pages 83 to 84 of the jurisdictional statement appendix, is where the court says these are all inextricably intertwined, they all apply a 55 percent threshold. And if you compare that to footnote 25 at page 34, that's where the court relegates the House's expert on traditional districting criteria. And we think that that imbalance really was borne out with some of these districts like District 92, which the House has already mentioned. District 69 is another example I would point the court toward, where there's discussion – I grant you there's discussion in the district court's decision of here are a few different precincts. We could imagine racial motives for these. But the opinion does not talk about the clear non-racial motives in that district moving the district up to align with the James River, making it more compact, making it more Richmond-centric. And that's not the predominance analysis that this Court has called for. Thank you. Roberts. Thank you, counsel. Mr. Heitens. Mr. Chief Justice, and may it please the Court. There is only one sovereign whose law was declared unconstitutional by the Federal District Court. And what this Court is essentially being asked to do is to referee a dispute within the Virginia State government about whether Virginia should appeal that decision to this Court. But Virginia law has been clear since before the Civil War that the State's attorney general has the exclusive authority to make that sort of litigation decision. Well, here in the beginning, the State's attorney general was happy to have the House take over the litigation. I – the State's attorney general did not oppose intervention. I agree, Mr. Chief Justice. But I think that the disposing of that is the trial brief that was filed by the State's attorney general. This is at JA 3861, where the attorney general made very clear that the House – excuse me – that the attorney general, on behalf of the six named defendants and on behalf of the Commonwealth, was allowing the defendant intervenors to take the lead in the litigation, but he did not say and has never said in this nine-volume joint appendix you will find no statement by the House that they are purporting to represent the Commonwealth of Virginia, much less the six named defendants, and you will find no acquiescence with the attorney general that anyone other than the attorney general represents the Commonwealth and the six named defendants. I have two points. Alito, you might be right, and the statute that you point out does say that it is the responsibility of the attorney general to represent the Commonwealth in civil litigation, but I don't know whether it's perfectly clear, and the House has been permitted by the Virginia Supreme Court to intervene. We don't know on exactly what theory. So if the issue, whether the House is authorized under some circumstances and these circumstances to represent the Commonwealth, is – if that's open, I don't know why we shouldn't certify that to the Virginia Supreme Court. Justice Alito, I understand that concern, and I don't think the Court has to get into it. I think part two of this Court's opinion in Carcher just resolves that, because if you look at the House's intervention motion, if you look at their statements before the district court, they never once purported to intervene to represent the State's interest. So far as I can tell, the very first time in this entire litigation that this House – excuse me – that the House ever suggested that they could represent the State's interest in standing to appeal. And Carcher, in part two of its opinion, says, as clear as possibly can, you're not allowed to shift grounds when someone challenges your standing to appeal. So I think the Court does not need to get into that, Justice Alito. Let me go to the question about divided constituencies. There was a question about that. I have two quick responses on that. I don't think that can be a viable theory of standing for two separate reasons. Reason number one, if that were true, then this Court's decision in Whitman was unanimously wrong, because all three of the Congress members in Whitman could have said, as a result of this remedial map, I'm going to represent a new constituency. And the Court did not say they had standing on that theory. The Court never even entertained the idea they had standing on that theory. Reason number two, if you adopt that theory of standing, it will have serious Federalism implications, because you will be taking away the State's ability to decide for themselves. Breyer. What do you suggest? I mean, the way you want it with no standing, you have a Democratic House, a Democratic governor, and they don't like the plan, they don't like the court decision, they'll appeal it. Or Republican, same party, same thing. But you get a Democratic House and a Republican governor, or Republican House and a Democratic governor, and it could be the worst plan in the world, or it could be the best plan in the world, or the Court could be wrong or the Court could be right. But one thing for sure, nobody's going to be able to attack it. It's the House's plan. If you say they can't attack what the Court did, then who can? The governor won't, because he likes it politically. So who will? Justice Breyer, my fundamental submission is that this is a who-decides question. This is a classic question of who makes the decision on behalf of the State. And Virginia has made one choice. Now, we're not suggesting that another question of who decides on behalf of the State Now, we're not suggesting that another question of who decides on behalf of the State where the government is divided between the parties, then, in circumstances like this, nobody will challenge it. But nobody can, because we will have held nobody can. But where the elections turn out that it's the same governor party and the House party, it's all different. Now it is possible to challenge it. Now, if there's no – I would like you to say, there is no way to challenge it. Or, where there's the difference. Or, if there is, tell me what way. Sure. Three thoughts, I think, on that, Justice Breyer. First and foremost, I think positing that elected officials who are empowered to exercise government power will make decisions that way is inconsistent with the presumption of good faith that this Court affords to government. This Court has repeated – this Court has – I just think this Court should be very hesitant to adopt a theory of Article III standing that turns on whether the challenger can allege that the decision was made for political reasons. I think that's number one. Well, maybe you don't need an allegation. You can just use common sense. That the legislature – well, you know what I mean. I mean, it – I haven't seen the case, I don't think, where the Democratic legislature has challenged a – alleged gerrymander because it was too favorable to Democrats, or vice versa. Mr. Chief Justice, I think there could be a lot of finger-pointing on every side in this case. We're not alleging anything. I'm just saying – nor are the parties. I'm just saying, is there a way to challenge standing? Should what I say be truthful in fact? Whether it's an allegation, not an allegation, or not. Is there any way to maintain – can somebody challenge? I don't think the Court needs to decide in this case. But I'd like to decide. So tell me who you think – who you think could challenge. One of – isn't one of the points here is that it's a matter of State law, really. There are many States that have responded to this exact circumstance by allowing the legislature to proceed. North Carolina. And other States, like Virginia, that have not. And in some sense, this – the question of whether somebody should be able to get to court in this partisan, divided circumstance is one that a State can decide for itself. Yes. And, Justice Breyer, yes. I was looking for an answer, honestly. And, Justice Breyer, to return to your question. I have one. Okay. Thank you. Well, I also don't think this Court needs to decide in this case whether an individual legislator or candidate would have standing. The reason you don't need to decide that is because no individual legislator nor candidate ever tried to intervene in this case. This Court left that question open in Whitman. As the Federal Government points out in its brief, that question is still open here. So you don't need – to decide this case, you do not need to definitively decide that no one would have standing, because this Court has no occasion here to decide whether an individual legislator. Suppose there was an affidavit by some administrative officer of the House that said, this is going to cost us $26 in administrative expenses. Would the House have standing? No. Why not? That's not injury, in fact? It is an – it is an economic injury, but this Court has been clear that what you need is a judicially cognizable injury, and I don't think that would be a judicially cognizable injury to the House qua the House. No one is disputing there's a judicially cognizable injury here. No one is disputing that someone could have appealed here. But the judicially cognizable injury is to the sovereign whose law was declared unconstitutional, and that sovereign is the Commonwealth of Virginia, not one of the constituent parts of the State government. That's our fundamental submission, is that this is a matter of State law. Virginia has a State law. Alitoson So you're really not talking about injury, in fact. You're talking about some other limitation on – and I can understand it. It's coming from someplace else, but it doesn't have to do with injury, in fact. Well, Justice Alito, I've understood the judicially cognizable injury to be part of the injury, in fact, inquiry, that this Court has said it's not just enough to have something that could be described as an injury in general. It has to be a judicially cognizable injury, and my view would be that's not a judicially cognizable injury to the House of Delegates apart from the Commonwealth of Virginia. What do we – what do we do with Beans? If I were a lower court judge, I would think Beans is controlling. So are you asking to overrule Beans, distinguish it in some way? Justice Kavanaugh, we are not asking you to overrule Beans. We're asking you to say two things about Beans. The first is to recognize that if Beans is still good law, it, along with United States v. Scrap, which was decided one year after Beans, is the outermost limit of standing that this Court has ever recognized, and that its reasoning, the reasoning of Beans itself, which is limited, I admit, has been squarely repudiated by this Court's subsequent decisions. I'd say that's thing one. Thing number two is to say that Beans is fundamentally different because altering the size of the body affects the structure and nature of the body in a way that redrawing lines does it. Let me give you a concrete example. Under the Virginia House of Delegates' current rules, all committees have 22 members, and only one – and a person can only be the chair of one committee. If you slashed the body in half, you would almost certainly have to revise both of those rules because otherwise you'd be in a situation where nearly 50 percent of the body was a member of every single committee. But I would have thought that the response would be that the members of the House have – or Senate, in that case – have no more interest in that than they would in this, that the people get to decide how big their house is and what lines are drawn. Now, again, Justice Gorsuch, I think Beans is at best the outermost limit of this Court's standing jurisprudence, and our fundamental submission is you should not extend it from the very specific situation presented there to the much more common situation presented here. Thank you. Roberts. Thank you, Mr. Heidens. Mr. Elias. Mr. Chief Justice, and may it please the Court, it is not in dispute in this case that the Commonwealth of Virginia adopted a one-size-fits-all, 55 percent racial rule that had a direct and significant input – impact on the drawing of district lines in each of the 11 challenged districts. Voters were placed within and without of the district based on those lines. Well, what the solicitor – the Federal Government solicitor general says is that you're right, but it was too extreme, that they didn't look at other factors that had to do with the redistricting, but sort of the flip side of the prior error, that they just looked at – the Court was wrong in reviewing it to simply look at that same statistical figure. Well, I don't think you can fairly read the district court's lengthy decision and say that it didn't look on a district-by-district basis. Obviously, to use a phrase that Mr. Chief Justice, you used, the elephant in the room in this case has been the 55 percent rule. So it would be odd for the – for the opinion not to address that rule at the outset. But it did, in fact, do a district-by-district analysis. Well, I actually had a different elephant in mind, which is the fact that the prior judicial panel found, you know, A, B, and C credible, and D, E, and F, incredible, and then the different panel found the exact opposite for the exact witnesses. And that, I understand, is a basic element. If you're looking at a case, the clearly erroneous standard applies. But it seems an awkward position for us to be in and saying, well, these directly 180-degree findings are clearly – or are not clearly erroneous, when we would have found the exact same thing the other way if that panel had been before us. So I'd offer two answers to that, Mr. Chief Justice. The first is a factual matter in this case. After Bethune Hill won, when this Court remanded the case back to the district court, the question that the district court faced was what to do next. It was at the insistence of the appellants in this case that the record be reopened and that further testimony be heard. And in fact, if you look at ECF 146, note 4, the reason they gave why the record needed to be reopened was so that the new judge who had been assigned to the three-judge panel could hear witnesses and make credibility determinations. So it is an odd circumstance indeed for my friend to now be suggesting that having urged and successfully, over our objection, I might add, reopened the record so that the new member of the panel could hear credibility determinations, to now be complaining about those. No, but I understand. But whether or not that's significant depends on how much weight you give to the new evidence. But I mean, the reality is that everything Jones said was the truth the first time, and now everything he says the second time is not. And it just seems to me that I don't know, it strikes me as a little awkward to apply the very deferential, clearly erroneous standard when you've got this other findings that are the exact opposite. So that brings me to the second point, which is this Court in Cooper faced a more extreme version of that, as you recall, where you had the State court had found one set of factual determinations with respect to why the North Carolina map had been drawn a certain way, and you had the Federal court using essentially the same, in the same basic set of facts, weigh the evidence the other. And this Court had to decide what to do in that instance and applied what was the appropriate rule there and the appropriate rule here, which is that the case before it is the case for which that deferential clear error review is appropriate. These three judges had the benefit not just of the evidence in the second trial, but the evidence in the first trial. So who was in a better position to judge whether Jones was credible? A three judges who saw him once or three judges who could compare his first testimony to his second, as well as the testimony of additional witnesses? Obviously, the second panel had more information regarding Delegate Jones and the experts and the other witnesses. Everyone agrees here that there needed to be 12 majority-minority districts, right? We agree that there were 12 majority-minority districts under the benchmark plan and under Section 5. So I'll take that as a yes. Well, they had to do a functional analysis, Your Honor, and what that meant is that they needed to prove that there was not retrogression. Whether retrogression would leave them at 50.1 or 49.9 is part of the inquiry that would have been done. Well, if you have to have a majority-minority district, and I thought it was also widely agreed that a bare majority would not be good enough for any of these districts, and then you consult and you consult with the Black Caucus and you consult with others and everyone agrees it has to be more than a bare majority, I'm wondering why 55 is so problematic here. Given that the states have to have some flexibility, I don't know, pinpointing 53.5 versus 54.2 versus 55, when they've done the kind of outreach and consulting, everyone approves, the Attorney General, the U.S. Attorney General pre-clears, I'd just like your response to all of that. Sure. Justice Kavanaugh, I'd offer three responses. The first is that I don't think it's – I don't think the trial record is fairly read, and the district court certainly did not find that Delegate Jones consulted the entire Black Caucus. His original testimony was he consulted everyone, then it was he consulted some, then it was – Is it correct that the Black Caucus was supportive of the plan? I think that members of the Black Caucus testified in the second trial that they were told that the – and this is their words – the gospel according to Jones was that every district had to be 55 percent, and they – for VRA compliance, and they assumed that was correct. But if you look at the testimony of the African-American members in the second trial, they will say that they did not believe that, in fact, their – in order to have an ability to elect district, it needed to be that high. The second answer I'd give you is I think it would be very instructive for this Court to look at two things. The first is the Senate plan, which hasn't gotten a lot of play in the briefing. But the Senate plan was being adopted at the same time, and the Senate plan involved a number of African-American districts as well, five, and all five of those, which cover the same geographic regions, were under 55 percent BVAP. So the idea that – that Delegate Jones had no information available to him that suggests it could be below 55 percent is contradicted by the fact that the Senate plan, which was in the same bill and involved the same geographic regions, all were under 55 percent. The second thing that I think would be useful for the Court to look at, both on the question of predominance and on the question of strict scrutiny, is HD-75. So HD-75 is the one of the 12 districts where they find predominance, but strict scrutiny is met. So let's look at the facts of HD-75. HD-75 was above 55 percent before and after the 2011 redistricting. So it wasn't materially increased or decreased. In fact, the BVAP only changed from 53 – 55.3 to 55.4. So many of the arguments my friend makes about how this district or that district didn't change very much, well, it didn't change very much in HD-75 either, and the Court found predominance. It retained 78.8 percent of its core. Another argument that my friend makes about, well, look, but it was core retention. Well, HD-75 was core retention, and the Court found predominance. On its face, the district appears relatively compact, the trial court found, but yet it found predominance. And finally, Delegate Jones offered a political explanation for why he did that draw. Again, something that is offered here. The facts of HD-75 are not very different in terms of finding a predominance than the districts that the district might be too. But again, if a State faced with these facts said we're going to do 52 percent or 53 percent, they would be hammered from the other side saying you are discriminating against African-American voters because you're not giving the voters a sufficient opportunity to elect the candidate of their choice. And so they do more here by going with 55. And I guess, again, on the State flexibility point, I'm just wondering how a State can try to comply with the demands of the Voting Rights Act on the one hand, and as you started with the demands of the Equal Protection Clause on the other. In this narrow band between 51 and 55. So, Justice Kavanaugh, let me articulate it this way. If the State creates a 55 percent blanket rule because of how African-Americans in a rural area vote on the border of North Carolina and then generalize that to urban that triggers strict scrutiny. Now, in H.C. 75, they were able to meet that burden, but it is simply not this Court in Alabama was clear, this Court in Cooper was clear, and this Court in Bethune-Hill 1 were clear, was clear. If the State engages in that kind of one-size-fits-all mechanical floor or mechanical trigger, then strict scrutiny applies. Now, strict scrutiny. I understand what you're saying, Mr. Elias, because what I've understood is that the flexibility that Justice Kavanaugh is talking about is critical, and Alabama talked about this, and Cooper talked about this, but it's critical at the point where you ask whether the Voting Rights Act has provided a sufficient justification for the State to get over strict scrutiny. And there, you know, we don't expect the State to actually have the exact number. But it's not relevant to the point of whether race has predominated in the first place, is it? Elias, I've been assuming predominance. Oh, I'm sorry, then I misunderstood. So on strict scrutiny, look, the truth is that all the State of Virginia had to do was come in with a good reason. And in this case, they came in with no reason. And it's really that – it's really, honestly, that simple. Good reasons complying with the Voting Rights Act to ensure that African-American voters have the opportunity to elect the candidate of their choice. But they weren't – And it's pre-cleared by the U.S. Justice Department. Well, first of all, there is nothing in the record that suggests that they drew this plan to comply with Section 2 of the Voting Rights Act. The sole argument in the record was that it was necessary to comply with Section 5 of the Voting Rights Act, and Alabama – that case is Alabama. Alabama already said that a misunderstanding, that you need a racial – that you need a – a mechanical test to meet pre-clearance, misunderstood what was required under Section 5, it was not consistent with what DOJ practice was, it was not consistent with DOJ guidelines were. The State of Virginia could not have believed, if it had looked at Section 5 guidance, that it needed this 55 percent rule statewide to comply. And in fact, the Senate plan, which was in the same bill, had – Well, DOJ pre-cleared it, though. DOJ pre-cleared it, but DOJ was not charged with looking at whether it was a racial gerrymander or not. They were solely charged with looking at whether or not it retrogressed. The Alabama plan had been pre-cleared. That was struck down by this Court. Mr. Rice, if I could go back to the predominance inquiry, one of Mr. Clement's arguments, I think, is something like, well, if you have this 55 percent non-negotiable target, you know, that might be evidence for all districts, but it doesn't get you over the bar for all districts, because there might be some districts, they're way over 55 percent, so that you can move people in and move people out and never really think about the 55 percent target in anything that you're doing. And that what the Court got wrong here was not recognizing that fact. So why isn't that right? Well, for two reasons. First of all, I think the Court addressed district by district that there were, in fact, black voters moved based on race on a district-by-district basis. And that's part of the reason why, Justice Kagan, I pointed you to the facts of HD-75, where predominance was found and BVAP went from 55.3 to 55.4. The test is not whether BVAP stayed the same. The question is when you had to add population as a whole, did you choose voters based on race? And if you look at Joint Appendix 2782 to 85, you can see the BVAP moved in and the BVAP moved out in each of these districts. And the numbers, frankly, are fairly startling. HD-71, 9,674 black voters were moved in, 2,000 black voters were moved out. HD-89, 8,000 black voters were moved in, 3,900 black voters were moved out. Roberts Well, this is in a context where you are required to consider race to comply with Section 5 of the Voting Rights Act. Verrilli, Jr., Correct. And had, Your Honor, had the State, had the Commonwealth of Virginia done even a modicum of district-by-district analysis, this would be a very different case. If it had done the same analysis that the State Senate did, it would be we wouldn't be here. If it had done the same thing that was done with respect to Delegate Tyler's district in HD-75, we might have been here, and I would have lost, as I did, as we did the last time when I challenged, when we challenged HD-75. But in these districts, it is virtually uncontested, and it is certainly not clear error that in the words of the district court, the legislature engaged in no analysis of any kind, and that's JS App 88, no analysis. Thank you, Your Honor. Roberts Thank you, counsel. Mr. Clement, you have three minutes remaining. Clement Thank you, Mr. Chief Justice. Just a couple of quick points on standing and on the merits. First, on standing, I don't think you can underestimate the impact of this case and the decision below and the remedial order that follows on the House and the way it operates day to day. The remedial order reconfigured 25 of the 100 seats that's fully 25 percent of the House's seats. That's much more than a peppercorn. I don't think the solution is to get 25 individual members here, and I think it's a mistake to think of the districts that basically set up the basic representational structure of the House. Sotomayor Mr. Clement, what do we do now? If we rule in your favor and say that every house that has or creates a plan has standing, we invite complete discord in a State over who represents the interests of that law. Clement I don't think there's any discord, because my friends of the other district, every house body can come in, so can their attorney general, presumably and possibly some individual members. I mean, this is a radical new step. Clement I don't think it has anything, this case has anything to do with whether the members are going to come here. I don't think having 25 members with standing is better than having the House, especially when these basic lines that determine how they're going to be organized are critical. I also don't see how you could not recognize standing here without overruling your decision in Beans. I mean, Beans may be a more extreme version, but it's the same as the other district. Ginsburg It hasn't been cited, Mr. Clement, in 30 years. Beans was of an age when there was a much more relaxed view of standing than there is now. Clement I don't think that decisions come with expiration dates. The fact that you haven't cited it in the last 30 years doesn't mean that you wouldn't have to overrule it, and I don't think you should. And I think the important thing is that even if there's a difference in degree, as Justice Alito suggested, even a $5 injury is injury. In fact, there's much more than that, and it goes to the heart of how this House organizes itself. Just on the merits, two quick points. First of all, I don't think, I think it would be a huge mistake on predominance to just say this is clear error and be done with it. The difference between the districts here and the districts in Alabama are completely stark. You looked at a district in Alabama, and they moved out 16,000 people, and only 30, or in 16,000 people, only 36 of whom were white. Here, with HD69, there's a 1 percent difference in the racial makeup of the people who went in and out of the district, 44 versus 43 percent. You cannot say that race predominated here faithfully with this Court's precedence about what predominance means. And then, if you get to strict scrutiny, Justice Kavanaugh, you asked about whether the African-American caucus supported this law. All but two members of the African-American caucus supported this law. One of the two members who didn't was the district in HD75. She didn't support the law because she thought that the BVAP of 55 percent was too low. And that just shows you the dilemma that people face. And this is not a case like Alabama, where the state picked a cartoonish figure and said, in order to avoid retrogression, they have to stay at 75 percent. This is a case where they picked 55 percent, which, frankly, is exactly the right number to avoid retrogression in contested primaries. Thank you, Your Honor. Roberts. Thank you, counsel.